## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JESUSA GARCIA WRIGHT, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | Civil Action No.  11-00531-B |
| | * | |
| CAROLYN W. COLVIN,[1] | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

## ORDER

Plaintiff, Jesusa Garcia Wright (hereinafter "Plaintiff"), brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for period of disability and disability insurance benefits under Titles II and part A of Title XVIII of the Social Security Act, 42 U.S.C. §§ 401, *et seq*.  On October 12, 2012, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 18).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.    Procedural History

Plaintiff protectively filed an application for period of disability and disability insurance benefits on August 5, 2009. (Tr. 101-104).  Plaintiff alleges that she has been disabled since

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

April 27, 2009 due to anxiety, depression, and insomnia. (Id. at 119).  Plaintiff's application was denied initially (id. at 51), and she timely filed a Request for Hearing. (Id. at 57-58).   On November 15, 2010, Plaintiff and her attorney attended an administrative hearing before Administrative Law Judge Renee Blackman-Hagler (hereinafter "ALJ"). (Id. at 33).   A vocational expert ("VE") also appeared at the hearing and provided testimony. (Id.).   On February 25, 2011, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 13-15).  The Appeals Council denied Plaintiff's request for review on July 20, 2011. (Id. at 1-3).

The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  <u>Issues on Appeal</u>

A. Whether the ALJ erred in rejecting the opinion of Plaintiff's treating physician and in rending the residual functional capacity assessment?

B. Whether the ALJ violated Plaintiff's due process rights by not providing Plaintiff with a supplemental hearing?

## III.  <u>Factual Background</u>

Plaintiff was born on December 24, 1956, and was fifty-four years of age at the time of the administrative hearing. (Tr. 35).  Plaintiff earned a high school education and completed one year of community college. (Id. at 36).  According to Plaintiff, she worked as a sewing machine operator for fifteen years, as a make-up artist and sales representative at a local department store for six years, and then as a teller, head teller and loan officer for a credit union for six years. (Id. at 35-39, 120, 164).  Plaintiff testified that she is unable to work because of deep depression and stress. (Id. at 39).   Plaintiff also testified that she suffers from TMJ, and that due to her

depression, she has difficulty sleeping at night, desires to stay in bed all day, tends to become irritated and experiences feelings of nervousness. (Id. at 39- 41, 44-45).

With respect to her functional abilities, Plaintiff testified that she has no problems walking, standing, sitting, lifting, carrying, stooping, gripping, squatting, climbing stairs, or picking up items. (Id. at 42-43).  She also testified that she can bathe and dress herself without being reminded by anyone; that she attends church and meetings, that she visits with family and friends in their houses, and that on average, she gets out of the home about three times a week. (Id. at 43-44).  Additionally, Plaintiff testified that she does some cooking, cleaning, sweeping and laundry, but her husband makes the beds, takes out the trash, and cleans the bathrooms. (Id. at 43).  Plaintiff also testified that she drives; however, sometimes, she gets sidetracked, so her husband usually drives her.  Plaintiff further testified that she has trouble going to the grocery store or places around other people when she gets nervous, and that she has difficulty concentrating and is unable to watch an entire television show. (Id. at 42, 44-45).  Plaintiff also relayed, in a Function Report, that she pays bills, and can read, write, do simple math, and make change. (Id. at 36-37, function report).

## IV.   Analysis

### A.   Standard Of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[2] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the

---

[2] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Id.; Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

### B.    Discussion

An individual who applies for Social Security disability benefits must prove her disability. 20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a).   The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.[3]  20 C.F.R.

---

[3] The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth

§§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since April 27, 2009, and that she has the severe impairments of dysthymia, acute reaction to stress, and dysmenorrhea. (Tr. 18).  The ALJ also determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations. (Id. at 22).  Specifically, the ALJ found that Plaintiff has moderate limitations in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain concentration and attention for extended periods of time.[4] (Id.).

Considering Plaintiff's RFC and the VE's testimony, the ALJ determined that Plaintiff is capable of performing her past relevant work (hereinafter "PRW") as a sewing machine operator, which is unskilled worked performed at a light exertional level. (Id. at 25-26).  Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

---

step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); see also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[4] The ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they are inconsistent with the RFC assessment. (Tr. 23).

1. **Medical Evidence**

Plaintiff has been treated by Dr. Ndolo, MD at Premier Internal Medicine (hereinafter "Premier") for a variety of ailments dating back to 2000[5]. (Id. at 179-81, 254-343).  In September 4, 2002, Dr. Ndolo first diagnosed Plaintiff with anxiety and treated her with medications, including Xanax[6]. During a March 10, 2003 visit, Dr. Ndolo diagnosed Plaintiff with dizziness, headaches, GERD, dyspnea, and anxiety, prescribed Alluna (for sleep) and Xanax, and instructed Plaintiff to sleep. (Id. at 263.).  The records reflect that during her June 1, 2005 visit, Plaintiff reported headaches, nausea, vomiting, diarrhea, fever, and sinus congestion, and Dr. Ndolo diagnosed her with food poisoning and prescribed Lexapro[7], which treats generalized anxiety disorder and depression. (Id. at 270).

During Plaintiff's May 4, 2009 visit, she reported decreased sleep, increased stress, and abnormal bleeding and indicated that she believed it was caused by stress.[8] (Id. at 278).  The treatment notes reflect that Plaintiff felt stressed due to being recently demoted. (Id.).  Dr. Ndolo diagnosed Plaintiff with dysmenorrhea, anxiety, insomnia, and acute reaction to stress. (Id.).

---

[5] Although the record contains Dr. Ndolo's treatment records dating back to 2000, only those that are related to Plaintiff's claims in the instant action are discussed.

[6] Xanax Tablets (alprazolam) are indicated for the management of anxiety disorder (a condition corresponding most closely to the APA Diagnostic and Statistical Manual [DSMIII-R] diagnosis of generalized anxiety disorder) or the short-term relief of symptoms of anxiety.  See www.accessdata.fda.gov/drugsatfda_docs/label/2011/018276s045lbl.pdf.  (Last visited February 21, 2013).

[7] Escitalopram (marketed as Lexapro) is included in the class of drugs called selective serotonin reuptake inhibitors (SSRIs).  This class of drugs is used to treat depression, anxiety, and other mood disorders. See http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafety Information forPatientsandProviders/DrugSafetyInformationforHeathcareProfessionals/PublicHealthAdvisori es/ucm053342.htm.  (Last visited: February 21, 2013).

[8] Plaintiff first began reporting abnormal bleeding in 2002. (Tr. 260).

Plaintiff was prescribed Xanax, Provera[9], and Sonata[10] and, was shown relaxation techniques. (Id.).  Dr. Ndolo also recommended that Plaintiff take time off of work until May 12, 2009. (Id.).

Additionally, on May 4, 2009, Plaintiff saw an obstetrician and gynecologist, Dr. McCool, and reported  "irregular bleeding for 5 months…with maybe 1 week out of the month without bleeding." (Id. at 187).   Dr. McCool's opined that she suffered from "dysfunctional uterine bleeding" but was in "no acute distress." (Id. at 188).   During the visit, Plaintiff reported that she was suffering from stress, but denied anxiety, depression, confusion, difficulty sleeping, excessive anger, or  suicidal/homicidal ideations. (Id.).  Dr. McCool prescribed  Lexapro[11].  On that same day, Plaintiff underwent a vaginal ultrasound that revealed an abnormal uterine cavity, a single fibroid tumor, and a possible endo polyp[12]. (Id.).  On May 6, 2009, Plaintiff underwent another ultrasound that confirmed that Plaintiff had an anterior corpus uteri polyp. (Id. at 191). Later, on June 19, 2009, Dr. McCool performed a hysteroscopy[13] and dilation and curettage on Plaintiff. (Id. at 202).  During the surgery, Dr. McCool removed the endometrial polyp and noted

---

[9] Provera is the brand name for medroxyprogesterone, which is a progestin (a form of progesterone), a female hormone that helps regulate ovulation and menstrual periods. Medroxyprogesterone is used to treat conditions such as absent or irregular menstrual periods, or abnormal uterine bleeding. See http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index. cfm?fuseaction=Search.Label_ApprovalHistory#apphist.  (Last visited: February 22, 2013).

[10] Zaleplon (marketed as Sonata) is used to treat short-term difficulty in falling asleep. See http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsand Providers/ucm103285.htm.  (Last visited: February 22, 2013).

[11] Lexapro is a prescription medicine used to treat depression. See www.fda.gov/downloads/Drugs/DrugSafety/ucm088620.pdf.  (Last visited: February 22, 2013).

[12] Uterine polyps are overgrowths of tissue (benign tumors) in the lining of the uterus (endometrium) that project into the uterine cavity. See http://www.nlm.nih.gov/medlineplus/ uterinediseases.html.  (Last visited: February 22, 2013).

[13] Hysteroscopy is a procedure that allows your doctor to look inside your uterus in order to diagnose and treat causes of abnormal bleeding. See www.ncbi.nlm.nih.gov/pubmed/3053254. (Last visited: February 22, 2013).

that other than the polyp, Plaintiff's endometrial cavity was normal. (Id.).   The record does not contain any additional treatment records from Dr. McCool.

The treatment notes from Plaintiff's May 12, 2009 and May 25, 2009 visit to Dr. Ndolo reflect that Plaintiff reported increased anxiety, which was causing palpations in high anxiety areas, frequent panic/anxiety attacks, decreased sleep, and abnormal uterine bleeding. (Id. at 278-280).  Dr. Ndolo diagnosed Plaintiff with acute reaction to stress, insomnia, fatigue, anxiety, and dysmenorrhea. (Id.).  He continued Plaintiff on medications, referred her to Dr. McCool, and recommended that she continue to take time off of work.  During Plaintiff's visit to Dr. Ndolo in June 2009 and July of 2009, she was diagnosed with chest pain, HTN, upper respiratory infection, TMJ syndrome[14], nausea, migraine headache, acute reaction to stress, dysmenorrhea, insomnia, heart palpitation[15], and anxiety.  (Id. at 282-84).

On June 23, 2009, Plaintiff reported chest pain, palpitations, migraine-type headaches, acute reaction to stress, anxiety, and insomnia. (Id. at 209).  Dr. Ndolo had her admitted to Thomas Hospital for further evaluation and management, particularly of the chest pain and palpations. (Id. at 209-10).  Dr. Ndolo noted that Plaintiff was "rather sad and anxious looking, but [Plaintiff] was in no apparent acute distress." (Id. at 211).  Dr. Ndolo recommended an appropriate cardiology consultation and a psychological evaluation in light of Plaintiff's acute reaction stress. (Id. at 212).  While at Thomas Hospital, Plaintiff was examined by Dr. David Trice, M.D., who noted that while Plaintiff reported that she was having heart palpitation, on

---

[14] Temporomandibular joint and muscle disorders, commonly called "TMJ," are a group of conditions that cause pain and dysfunction in the jaw joint and the muscles that control jaw movement.  See  http://www.nidcr.nih.gov/OralHealth/Topics/TMJ/TMJDisorders.htm.    (Last visited: February 22, 2013).

[15] Palpitations are feelings or sensations that the heart is pounding or racing. See http://www.nlm.nih.gov/medlineplus/ency/article/003081.htm.  (Last visited February 22, 2013).

exam, he "did not detect an extrasystole." He further noted that Plaintiff had "[r]egular rhythm, no murmur, gallop or rub." (Id. at 214). A heart catheterization was conducted on June 23, 2003, and it revealed that Plaintiff "was without any cardiovascular symptoms, including chest pains or shortness of breath during the stress echo" and that Plaintiff had a normal hemodynamic response to exercise stress. (Id. at 217-219, 309). Additionally, the test was negative for evidence of ischemia[16]. (Id.). Plaintiff was discharged the following day. (Id.).

The record reflects that Plaintiff was treated at AltaPointe Health Systems[17] (hereinafter "AltaPointe") from May 2009 through July 2009 to address her difficulty with issues in the workplace. (Id. at 239-253). The May 27, 2009 intake evaluation reflects that Plaintiff's appearance was appropriate, her mood and affect were sad, her speech was normal, her appetite was fair, her sleep was poor, she had no suicidal/homicidal ideations, her perception was normal, her memory was impaired, her thoughts were racing and her concentrations was impaired. (Id. at 252). The notes reflect that Plaintiff's therapist at AltaPointe discussed coping remedies with her and acted as a liaison between Plaintiff and management officials at Plaintiff's job in an effort to assist Plaintiff in returning to work. (Id. 239-52).

Also, the June 10th and June 29th treatment notes reflect that Plaintiff's appearance was inappropriate, her behavior was agitated, her mood and affect were sad, her appetite and sleep were fair to poor, her perception was normal, her memory was impaired, her thoughts were impaired or racing, and her concentration was unimpaired on one visit, and impaired on the next. (Id. at 246, 249). During Plaintiff's June 29th session, the therapist observed that Plaintiff's

---

[16] Ischemia is deficient supply of blood to a body part (as the heart or brain) that is due to obstruction of the inflow of arterial blood. See www.merriam-webster.com/dictionary/ischemia. (Last visited: February 22, 2013).

[17] AltaPointe provides psychiatric consultation for hospitalized patients. See http://www.altapointe.org/professional_hosC.php. (Last visited: February 25, 2013).

condition has worsened over the weeks that she had been off work, and she recommended that Plaintiff used the coping skills discussed in therapy to return to work part-time.[18] (Id. at 249). Plaintiff advised the therapist on June 30, 2013, that her doctor was not ready to release her to return to work due to her heart palpitations. (Id. at 243).   On July 21, 2009, Plaintiff acknowledged to her therapist that she was aware that her medical leave was expiring the next day, and reported that she was unable to return to work because she felt mistreated by her employer, and that she was "'too angry to go back'" even though she would be automatically fired for not returning to work. (Id. at 241).   In an AltaPointe Discharge Summary, the clinician listed Plaintiff's condition as "unstable" and noted Plaintiff's failure to comply with treatment recommendations.  She also recommended that Plaintiff follow-up as needed. (Id. at 239).  The record does not indicate that Plaintiff sought any further treatment from AltaPointe.

Plaintiff did receive follow-up treatment from Dr. Ndolo in September, November and December, 2009.   On September 21, 2009, Plaintiff reported loss of sleep, headaches, depression, anxiety, and stress.  Dr. Ndolo noted that Plaintiff was  "emotionally traumatized by the way she was dismissed from her job," diagnosed her with acute reaction to stress, insomnia, palpitation, anxiety, headaches, and depression, and prescribed medications. (Id. at 285).   Dr. Ndolo's November 2009 and December 2009 treatment notes reflect that Plaintiff reported palpitations, shaking, and pain under her breast, and that her ECG results varied between normal, borderline, and abnormal. (Id. 372-77).

On December 31, 2009, Dr. Ndolo completed an RFC assessment.  In the assessment, Dr. Ndolo opined that Plaintiff had extreme limitations in the areas of activities of daily living,

---

[18] Plaintiff was advised to "let go of bitterness and unforgiveness" from past hurt, "focus on cultural issues that have affected her with her boss", refrain from passive aggressive behavior, teeth clenching, and yelling, and engage in relaxation techniques. (Tr. 247).

maintaining social functioning, and in concentration, persistence, or pace.  He also opined that Plaintiff would experience three episodes of deterioration or decomposition in work or worklike settings. (Id. at 369).  He further opined that Plaintiff had marked limitations in her ability to understand, carry out and remember instructions, respond appropriately to supervision, respond appropriately to co-workers, perform simple tasks, and perform repetitive tasks. (Id.).  Dr. Ndolo diagnosed Plaintiff with acute reaction to stress, anxiety, depression, insomnia, migraine headaches, palpitations, and chest pain and, opined that Plaintiff will "most likely" suffer from these impairments long-term and that her  medications "may cause drowsiness". (Id. at 370).

The record does not contain any treatment records from Dr. Ndolo for 2010, but it does contain a second RFC assessment that he completed on November 5, 2010. (Id. at 382-83).  In the RFC assessment, Dr. Ndolo opined that Plaintiff experiences marked limitations in the areas of daily living, social functioning, and concentration, persistence, or pace, and that she would experience four or more episodes of deterioration or decomposition in work or work-like settings. (Id. at 382).  Also, Dr. Ndolo opined that Plaintiff had mild limitations in the understand, carry out and remember instructions, respond appropriately to supervision, respond appropriately to co-workers, perform simple tasks, and perform repetitive tasks. (Id.).  He diagnosed Plaintiff with low back pain, depression, insomnia, TMJ syndrome, GERD, and dyspepsia. (Id. at 383).  Dr. Ndolo opined that Plaintiff might suffer "possible sedation, lethargy, etc." as side effects from her medication. (Id.).

The record also contains a consultative evaluation dated October 23, 2009 and completed by Dr. Kimberly Whitchard at the request of the Agency. (Id. at 344.).  Plaintiff reported to Dr. Whitchard that she was filing for disability because of the stress that "'started at work'" and that she had a suicidal intention of 7 out of 10. (Id.).  Dr. Whitchard observed that Plaintiff's

grooming and hygiene were good, her behavior was normal, her affect was appropriate, her mood was depressed, she was cooperative, her speech was normal, her thought processes were intact, she was alert and oriented, she was able to perform some calculations, her memory, judgment and insight were good, and that her intellect was in the average range of ability. (Id. at 346-347). Dr. Whitchard diagnosed Plaintiff with dysthymia and anxiety, and opined that her prognosis was good. Dr. Whitchard also recommended that Plaintiff consider therapy to help her address her marital problems and handle stress. (Id. at 347).

On October 27, 2009, Medical Consultant Ellen Eno, Ph.D., reviewed Plaintiff's medical records and completed a psychiatric review technique form and a mental residual functional capacity (hereinafter "RFC") assessment. (Id. at 351-68). She diagnosed Plaintiff with dysthymia and anxiety disorder NOS, and opined that Plaintiff has moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace. (Id. at 354, 356, 361). She further opined that Plaintiff is mildly restricted in activities of daily living, and that she experiences no episodes of decompensation. (Id. at 361). In the RFC assessment, Dr. Eno opined that Plaintiff is moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Id. at 365-66). Dr. Eno concluded that Plaintiff "has the ability to understand, remember and carry out very short and simple instructions," that she "can attend for two hour intervals," that her "contact with the general public should be minimal and infrequent", and that "changes to the work setting should be minimal, infrequent and structured." (Id. at 367).

In January 2011, Dr. Kendra LaConsay, Psy.D. conducted a consultative evaluation of Plaintiff at the request of the Agency. (Id. at 385-390). Dr. LaConsay found that Plaintiff's

appearance and behavior were appropriate, her speech was normal, and that Plaintiff described her mood as "stress[ed] and depressed." (Id. at 387). Dr. LaConsay opined that Plaintiff did not give her best effort during portions of the evaluation, and noted that she took inordinate amounts of time to perform simple one and two digit basic mathematical calculation and counting exercises. (Id. at 387-389). Dr. LaConsay observed that it was "likely that [Plaintiff] was malingering on this portion of the evaluation," especially because of her extensive background as a "teller, head teller, and acting bank manager." (Id.). Dr. LaConsay diagnosed Plaintiff with unspecific adjustment disorder, hypertension, arthritis, and occupational problems, and assigned her a Global Assessment of Functioning score[19] (hereinafter "GAF") of 68. (Id. at 389). Dr. LaConsay opined that it is likely that with Plaintiff's compliance with "psychological and/or psychiatric intervention to deal with her residual issues stemming for being upset at her previous work situation, she would be likely to return to a job setting." (Id.). Additionally, Dr. LaConsay noted that Plaintiff reported no significant medical condition that will preclude her return to work and that her return to work would actually "do her much good" because it would "allow her to focus her energies on more positive and rewarding things." (Id.).

Dr. LaConsay also completed a mental functional assessment. (Id. at 392-394). She

[19] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious social dysfunction (e.g., no friends, unable to keep a job). A GAF score of 51-60 suggests moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF score of 61-70 is indicative of mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. See http://www.gafscore.com/. (Last visited February 28, 2013).

found that Plaintiff is moderately limited in the ability to understand, remember, carry out and make judgments on complex work-related decisions. (Id. at 392). Dr. LaConsay also opined that Plaintiff "could very likely function at a most acceptable level if she were to work on issues of "forgiving and forgetting" r/t her negative issues with her past supervisor. She appears to be holding on to anger excessively, but her overall capabilities to function in a work setting should not be significantly impacted." (Id. at 392) (ellipses in original).

### 2.   Issues

#### a.   Whether the ALJ erred in rejecting the opinion of Plaintiff's treating physician?

In her brief, Plaintiff argues that the ALJ erred in rejecting the opinions set forth in the RFC assessments prepared by her treating physician, Dr. Ndolo. (Doc. 11 at 9). As noted *supra*, Dr. Ndolo opined that Plaintiff suffers from "'marked' and/or 'extreme' functional limitations," which preclude her from working. (Tr. 369, 382). Case law provides that the opinion of a treating physician "must be given substantial or considerable weight unless "good cause" is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists where: 1) the opinion was not bolstered by the evidence; 2) the evidence supported a contrary finding; or 3) the opinion was conclusory or inconsistent with the doctor's own medical records. Phillips v. Barnhart, 357 F.3d 1232, 1340-41 (11th Cir. 2004); see also Lewis, 125 F.3d at 1439-1441; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).

In this case, the ALJ did not grant any evidentiary weight to the questionnaires completed by Dr. Ndolo. The ALJ remarked as follows with respect to the questionnaires completed by Dr. Ndolo: "The undersigned has granted full consideration to all potentially applicable law in evaluating the opinions of Dr. Ndolo; however, there is no basis under the current record for granting Dr. Ndolo's conclusions controlling or substantial evidentiary weight." (Tr. 24-25).

14

The ALJ noted that while Dr. Ndolo, in the December 2009 questionnaire opined that Plaintiff had marked and extreme limitations from a mental standpoint, that her medications might cause drowsiness, and that Plaintiff "most likely" would have long term impairment,  Dr. Ndolo did not document any acute symptoms, and his treatment notes are devoid of any notation of Plaintiff's decompensation, or other objectively demonstrable evidence of impairments existing to the severity alleged in the questionnaire. (Id. at 24).  With respect to the November 2010 questionnaire, the ALJ found that the document was internally inconsistent because in one section,  Dr. Ndolo opined that Plaintiff had marked limitations in activities of daily living, social functioning, concentration, persistence and pace, and that she experienced episodes of deterioration or decompensation; however, in another section, he assigned Plaintiff mild limitations in work-related functions such as understanding, carrying out and remembering instructions in a work setting, and responding appropriately to supervisors and co-workers in a work setting. (Id.).  According to the ALJ, "it is not conceivable that Plaintiff would experience marked limitations from a mental stand point in broad area of functioning, yet experience only mild limitations with respect to specific mental functions in a sustained work setting." (Id.).  The ALJ also noted that there had been a near one year gap in treatment when the November 2010 questionnaire was completed, and that Dr. Ndolo's treatment records did not mention any ongoing side effects from the medication nor any accompanying psychiatric treatment. (Id.).

Having reviewed all of the evidence in this case, the Court finds that the ALJ did not err in rejecting Dr. Ndolo's opinions in the RFC questionnaires because as found by the ALJ, Dr. Ndolo's own treatment records do not support his opinions.  For example, Dr. Ndolo assigns Plaintiff "extreme" and "marked" limitations from a mental standpoint, yet the undersigned can find no evidence in Dr. Ndolo's treatment records that indicates debilitating symptoms or that

Plaintiff's mental condition was extreme enough to warrant more aggressive treatment, such as mental health therapy or in-patient treatment.  In fact, while Plaintiff did report chest pains and heart palpitations in 2009, and was briefly hospitalized as a result, the objective testing did not reveal any evidence of ischemia, or cardiovascular symptoms.  (Id. at 217-291, 309). Additionally, in Dr. Ndolo's November 2010 questionnaire, he opined that Plaintiff would experience marked limitations in various areas such as daily living and social functioning, yet he had not treated her in nearly a year, and the record does not reflect that Plaintiff was receiving mental health, or any other medical treatment during this time period.  Also, although Dr. Ndolo opined that Plaintiff's medications "might" cause drowsiness or "most likely" may have long-term impairments, his treatment notes does not reflect any reports from Plaintiff about side effects from her medication.  Also, while Plaintiff reported, during her January 2011 examination by Dr. LaConsay, that her medications help to relax; she did not report any drowsiness or any other side effects from her medications.  (Id. at 385).  It is also noteworthy that while Dr. Ndolo opined that Plaintiff experiences marked and extreme limitations, there is no evidence that he referred Plaintiff for mental health treatment, or that Plaintiff received any such treatment aside from her brief treatment at AltaPointe.  Because Dr. Ndolo's questionnaires were at odds with his treatment notes, the ALJ did not err in assigning the questionnaires no evidentiary weight.

Dr. Ndolo's questionnaires are also at odds with the other evidence of record in this case. As noted *supra*, Plaintiff was treated for a three-month period, May through July 2009, at AltaPointe for work-related stress.  While the records from AltaPointe reflect that Plaintiff experienced depression and at times, demonstrated symptoms such as inappropriate attire, poor mood and affect, racing thoughts, and impaired concentration, the therapist at AltaPointe actually encouraged Plaintiff to return to work and to put past hurts behind her.  Similarly, when Plaintiff

16

was examined by Dr. LaConsay in January 2011, Dr. LaConsay assigned Plaintiff a GAF score of 68, and opined that returning to work would "do her much good" because it would "allow her to focus her energies on more positive and rewarding things." (Id. at 389).   Additionally,  Dr. Whitchard  examined Plaintiff in October 2009, and found that Plaintiff's thought processes were intact, her memory, judgment and insight were good, and that her prognosis was good.   Also, medical consultant Dr. Eno reviewed Plaintiff's medical records and concluded that while Plaintiff has some moderate limitations, she does not have any marked limitations. (Id. at 365-367).

Finally, the opinions in Dr. Ndolo's questionnaires are contradicted by Plaintiff's own testimony at the administrative hearing conducted on November 15, 2010, and statements made by her in the Function Report.   Plaintiff reported that she is able to bathe and dress herself without being reminded by anyone, that she cooks and does some cleaning, that she manages her own financial affairs, that she attends church and meetings, that she visits family and friends in their houses, and that on average, she gets out of house about three times per week. (Id. at 36-37, 43-44, 253-254, 389).   This evidence demonstrates that the ALJ had good cause for rejecting the marked and extreme limitations contained in Dr. Ndolo's assessments, and for concluding that Plaintiff can perform a full range of work at all exertional levels with moderate restrictions discussed *supra*.

Plaintiff also contends that in formulating her RFC, the ALJ improperly relied upon the opinions of Dr. Eno, a medical consultant who did not physically treat or examine her. (Doc. 11 at 14-15).   According to Plaintiff, neither Dr. Whitchard nor Dr. LaConsay offered an opinion regarding Plaintiff's ability to maintain concentration, persistence or pace.   First, as noted *supra,* while Dr. Ndolo's treatment notes reflect that Plaintiff complained of stress and poor sleep, the

17

notes do not contain any reports of poor concentration or inability to complete tasks.  Second, the notes from AltaPointe clearly reflect that while Plaintiff exhibited some symptoms of stress, the therapist encouraged Plaintiff to return to work.  Further, while Dr. Whitchard's report does not include a mental functional assessment, she found that Plaintiff exhibited average intellect, good judgment and insight, that Plaintiff was able to perform serial 4's and simple word calculations, and that Plaintiff's prognosis was good.  Finally, Dr. LaConsay repeatedly questioned Plaintiff's effort and found that other than mild/moderate limitations related to Plaintiff's ability to understand, remember, and carry out detailed instructions, Plaintiff was not otherwise impaired. Dr. LaConsay further noted that Plaintiff did not report any significant medical condition and that returning to work could actually "do her much good". (Tr. 389).  In light of the record evidence, the Court finds that the ALJ's RFC assessment is supported by substantial evidence. Thus, Plaintiff's claim is without merit.

### b. Whether the ALJ violated Plaintiff's due process rights by not providing Plaintiff with a supplemental hearing?

In her brief, Plaintiff argues that the ALJ violated her due process rights by failing to hold a supplemental hearing to allow her to rebut the post-hearing consultative examination findings of Dr. LaConsay, who diagnosed Plaintiff with unspecified adjustment disorder and opined that Plaintiff's problems appeared to stem from her general attitude towards life as opposed to "true psychological issues." (Doc. 11, 17-20; Doc. 10-2 at 20).   Following Dr. LaConsay's examination, the ALJ properly proffered the report to Plaintiff's attorney and afforded Plaintiff the opportunity to submit additional evidence, as required by HALLEX[20] policies. (Doc. 11 at

---

[20] "HALLEX", the Hearings, Appeals, and Litigation Law Manual, is a policy manual written by Social Security Administration to provide policy and procedural guidelines to ALJs and other staff members. See Moore v. Apfel, 216 F.3d 864, 868 (9th Cir. 2000).

17-18).   Accompanying the post-hearing report was the relevant HALLEX policy, which

provides in pertinent part:

> You may submit any or all of the following: written comments concerning the enclosed evidence, a written statement as to the facts and law you believe apply to the case in light of that evidence, and any additional records you wish me to consider (including a report from the treating physician).   You may also submit written questions to be sent to the author(s) of the enclosed report(s).
>
> You may also request a supplemental hearing at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law.   If you request a supplemental hearing, I will grant the request unless I receive additional records that support a fully favorable decision.   In addition, you may request an opportunity to question witnesses, including the author(s) of the enclosed report(s).   I will grant a request to question a witness if I determine that questioning the witness is needed to inquire fully into the issues.   If an individual declines a request by me to appear voluntarily for questioning, I will consider whether to issue a subpoena to require his or her appearance.

(Id., exh. 1).   After receiving Dr. LaConsay's report, Plaintiff's counsel submitted a letter to the

ALJ and argued that Dr. LaConsay's opinion was inconsistent and Dr. Ndolo's opinions, and that

Dr. Ndolo's opinions should be relied upon by the ALJ in formulating Plaintiff's RFC. (Tr. 169).

At the conclusion of the letter, Plaintiff's counsel stated that if the ALJ did "not find the opinion

of Dr. Ndolo persuasive", then Plaintiff was requesting a supplemental hearing to rebut Dr.

LaConsay's opinion. (Id. at 170).   As noted *supra*, the ALJ did not grant "any evidentiary weight

to the questionnaires submitted by Dr. Ndolo" (id. at 24) and rendered her opinion without

granting Plaintiff's request for a supplemental hearing.

The fundamental requirement of due process is the opportunity to be heard "at a

meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.

Ct. 893, 47 L.Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187,

1191, 14 L.Ed.2d 62 (1965)).   Under 42 U.S.C. § 405(b)(1), when a hearing is held, the disability

determination must be made "on the basis of evidence adduced at the hearing." Post-hearing evidence is therefore afforded special treatment to ensure that the claimant is given the opportunity to respond, rebut, and request cross-examination. The HALLEX indicates that proffer of post-hearing evidence is required unless the claimant has knowingly waived her right to examine the evidence or the ALJ proposes to issue a fully favorable decision. (Doc. 11, exh 1). This Court has addressed what due process rights, if any, the HALLEX provides a Social Security claimant in Tarver v. Astrue, 2011 U.S. Dist. LEXIS 6133 (S.D. Ala. Jan. 21, 2011), and opined:

> [t]here is uncertainty—based on a split among the Courts of Appeals, as well as between the District Courts in the Eleventh Circuit —as to whether or not that HALLEX creates judicially-enforceable rights. What is certain, however, is that—if it does—remand is mandated only when the ALJ violates the procedures in the HALLEX, see George v. Astrue, 338 Fed. App'x 803, 805 (11th Cir. 2009) ("[E]ven if we assume that [the] HALLEX carries the force of law—a very big assumption—the ALJ did not violate it."), and if so, ***that violation prejudices the claimant***. See Maiben v. Astrue, 2010 U.S. Dist. LEXIS 19829 (S.D. Ala. Mar. 4, 2010) (ALJ's "undisputed" failure to comply with HALLEX is not grounds for remand if plaintiff not prejudiced).

(Emphasis added).

Thus, although the issue is unresolved, it appears clear that that "there must be a showing of prejudice before [a Court] will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995). In the case *sub judice*, the undersigned finds that Plaintiff has failed to demonstrate prejudice. Upon receipt of Dr. LaConsay's post-hearing report, the ALJ properly proffered the report to Plaintiff's counsel and provided Plaintiff an opportunity to "be heard . . . in a meaningful manner." Mathews, 424 U.S. at 333. As noted, Plaintiff's counsel acknowledged receipt of the report in a letter to the ALJ, and provided arguments as to why Dr. Ndolo's opinions should be given greater weight than

those expressed in Dr. LaConsay's report. (Tr. 168-170).  The letter from Plaintiff's counsel is in the record, and there is nothing to suggest that the ALJ did not consider the letter and other evidence of record in formulating her decision.   Thus, where Plaintiff was provided Dr. LaConsay's post hearing report and was given an opportunity to be heard, due process was satisfied. See Cowart v. Schweiker, 662 F.2d 731, 737 (11th Cir. 1981) (due process was violated when the ALJ did not give claimant an opportunity to examine or challenge post-hearing reports); but see Gardner v. Barnhart, 2004 U.S. Dist. LEXIS 12147 *64 (N.D. Ill. June 28, 2004) (finding no due process violation when ALJ denied supplemental hearing based on Plaintiff's attorney's letter refuting new medical evidence).

Further, Plaintiff has not suggested, let alone demonstrated, that she had evidence that may have affected the outcome of this case, and that she was precluded from submitting it at a supplemental hearing.  Given the complete absence of any such showing by Plaintiff, she cannot establish prejudice and her claim must fail. Brown, 44 F.3d at 935; see generally James v. Barnhart, 177 Fed. App'x 875, 877 (11th Cir. 2006) (finding no due process violation when ALJ failed to hold a supplemental hearing to allow claimant to rebut the post-hearing consultative examination findings of a physician because, *inter alia*, the post-hearing report was consistent with the reports of other consultative physicians and contradicted only the conclusory and unsupported findings of the claimants treating physicians); Adzima v. Commissioner of Soc. Sec., 2010 U.S. Dist. LEXIS 132784 (M.D. Fla. Dec. 15, 2010) (finding that despite the general rule, due process rights are not violated when the new evidence obtained by the ALJ is merely cumulative).

## V.      <u>Conclusion</u>

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for period of disability and disability insurance benefits be **AFFIRMED.**

**DONE** this **28th** day of **March, 2013.**

<u>/s/  SONJA F. BIVINS</u>
<br>
**UNITED STATES MAGISTRATE JUDGE**